**James D'OLIVIERA, Plaintiff,**

v.

**RARE HOSPITALITY
INTERNATIONAL,
INC., Defendant.**

**No. CIV. A. 00–229 L.**

United States District Court,
D. Rhode Island.

July 18, 2001.

Jeffrey S. Michaelson, Michaelson & Michaelson, Providence, RI, for Plaintiff.

R. Kelly Sheridan, Jr., Roberts, Carroll, Feldstein & Peirce, Inc., Providence, RI, for Defendant.

## OPINION AND ORDER

LAGUEUX, District Judge,

Plaintiff, James D'Oliviera, commenced this action as a one-count (Count I) breach of contract case in Providence County Superior Court, after the defendant refused to grant him severance pay under an employee severance plan. Plaintiff subsequently filed an amended complaint in Superior Court in which he added a claim for violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001–1194 (1974) ("ERISA" or "the Act"), which he designated as Count III. He also added a second breach of contract claim blaming defendant for his inability to exercise certain stock options, which he designated as Count II. Defendant, Rare Hospitality International, Inc. ("RHI"), removed the action to this Court on or about May 8, 2000, claiming that since the amended complaint stated an ERISA cause of action, a federal question was presented. Defendant later filed a motion for summary judgement, arguing that there is no basis in fact or law for plaintiff's allegations of breach of contract, or a violation of ERISA. Plaintiff argues that the severance benefit plans involved in this case do not constitute welfare benefit plans under ERISA, and thus requests that this case be remanded to state court for resolution of the state law breach of contract claims.

Therefore, the primary question before this Court is whether the two severance plans in question constitute ERISA plans. This Court concludes that neither severance plan is an ERISA plan, and therefore grants defendant's motion for summary judgement on the ERISA claim (Count III) and remands this case to Providence County Superior Court for adjudication of the two remaining state law claims for breach of contract (Counts I and II).

## I  Background

Plaintiff was employed by RHI's predecessor as a corporate executive chef at the Capital Grille, where a severance plan (hereinafter "original plan") had been established for the benefit of terminated employees. After the restaurant came under the ownership of RHI, plaintiff became an employee of defendant. The original severance plan was subsequently amended (hereinafter "new plan"), and became effective February 1, 1999. On or about March 3, 1999, plaintiff was offered severance benefits pursuant to the new plan on the condition that he resign. Because this severance pay amounted to roughly one third of the amount that the plaintiff thought he was entitled to under the original plan, he refused the offer. He was thereafter fired, and was denied severance pay completely. Furthermore, after having been informed his termination was "for cause," plaintiff failed to exercise his stock options.

Plaintiff filed this action to recover monies allegedly owed to him pursuant to the original plan, as well as damages to compensate him for the lost value of the stock options.

## II  STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a motion for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, the crucial question becomes whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Savings Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Morrissey,* 54 F.3d at 31. Summary judgment is only available when there is no dispute of material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996), reiterated in *Mills v. State of Maine,* 118 F.3d 37 (1st Cir.1997).

In this instance, however, plaintiff has failed to provide the Court with a Statement of Disputed Material Facts as required by Local Rule 12.1. Accordingly, the Court accepts the facts as they appear in Defendant's Statement of Undisputed Facts in support of its Motion for Summary Judgement. Local Rule 12.1 provides that "[a]ny party opposing a motion [for summary judgement] shall serve and file, together with the opposing memorandum of law required under Rule 12 of these Rules, a concise statement of all material facts as to which he contends there is a genuine issue necessary to be litigated." D.R.I.R. 12.1(a)(2). Moreover, in deciding a motion for summary judgement:

the court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion, or by other evidentiary materials which the court may consider under Rule 56 of the Federal Rules of Civil Procedure.

D.R.I.R. 12.1(d). The First Circuit has stated that parties ignore local rules at their own peril. *Rivera v. Riley,* 209 F.3d 24, 28 (1st Cir.2000). Rules such as Local Rule 12.1 provide needed structure to the summary judgement process and ensure that district court judges are not unfairly burdened by unrevealed factual issues. *See id.* (citing *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 931 (1st Cir.1983)). As such, plaintiff's failure to comply with Local Rule 12.1 results in this Court accepting as undisputed the facts provided by the defendant and addressing the questions of law in that light. *See id.*

## III DISCUSSION

### A ERISA

In 1974, Congress decided to protect employers and employees from the inefficiencies or abuses which resulted from the existing "patchwork scheme" of employee benefit plans. *Belanger, et al. v. Wyman–Gordan Co.,* 71 F.3d 451, 454 (1st Cir.1995) (citing *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)). By providing a uniform administrative scheme, it proposed to eliminate the disincentives which followed as a consequence of subjecting employers to conflicting state and local regulations. *Id.* at 454. Furthermore, it set out to minimize employer abuse or mismanagement of funds accumulated to finance employee benefits by mandating regulations to "safeguard the financial integrity of employee

benefit funds, to permit employee monitoring of earmarked assets, and to ensure that employers' promises are kept." *Id.* To this end, Congress adopted ERISA as a tool to regulate certain employee benefit programs.

The type of benefit plan governed by ERISA which is at issue in this case is an "employee welfare benefit plan." The Act defines an "employee welfare benefit plan" as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 ...

29 U.S.C. § 1002(1) (1994). "The benefits described in section 302(c)(6) of the LMRA but not in section 3(1)(A) of the Act are '... holiday, severance or similar benefits.'" 29 C.F.R. § 2510.3–1(a)(3) (2000). Thus, the effect of section 3(1)(B) of the Act is to include, within the definition of "employee welfare benefit plan," schemes that provide severance benefits. *id.* However, while a severance plan is included within the definition of "welfare benefit plan," it will not be treated as an ERISA plan unless the other statutory criteria are met.

This Court has stated that the ERISA statute is fairly broad and its terms are defined ambiguously, if at all, leaving the task of providing a clearer interpretation of the statutory provisions to the courts. *Champagne, et al. v. Revco D.S., Inc. et al.,* 997 F.Supp. 220, 221 (D.R.I.1998). The Supreme Court responded to this problem in *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (Maine statute requiring the payment of a severance benefit by employer who relocated did not amount to a "plan" for ERISA purposes). To "give meaning to [ERISA's] cryptic language," the *Fort Halifax* Court reasoned that the focus of the Act is on the administrative integrity of benefit plans, because only those plans which require ongoing administrative activity are subjected to employer abuse. *Belanger,* 71 F.3d at 454 (citing *Fort Halifax,* 482 U.S. at 16, 107 S.Ct. 2211).

■ When it decided the degree of administration involved in implementing the Maine statute was insufficient to create an ERISA plan, the Supreme Court reasoned:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize ... To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing

administrative program for processing claims and paying benefits. *Fort Halifax,* 482 U.S. at 12, 107 S.Ct. 2211. Therefore, the main inquiry is whether the plan in question relies on an ongoing administrative process for implementation. *Champagne,* 997 F.Supp. at 221–222.

■ The Court in *Gilmore v. Silgan Plastics,* 917 F.Supp. 685 (E.D.Mo.1996), elaborated on the *Fort Halifax* decision after considering it in the light of other federal court decisions. It outlined four factors to be considered when measuring the extent of ongoing administration for each severance scheme. These four elements include:

> (1) whether the payments are one-time, lump sum payments or continuous, periodic payments, (2) whether the employer is obligated over a prolonged or a limited time period, (3) whether the severance payments are triggered by a single event, such as a plant closing, or rather are continuous payments to be made generally to terminated employees, and (4) whether the severance "plan" requires the employer to engage in a case-by-case review of employees to determine their particular eligibility based on the applicable criteria. The last factor is frequently determinative.

*Id.* at 688.

Therefore, an inquiry into whether an employee welfare benefit plan may be classified as an ERISA plan requires a fact-intensive application of several factors, typically none of which on its own is determinative. *Champagne,* 997 F.Supp. at 222 (citing *Belanger,* 71 F.3d at 455). Rather, the existence of a plan turns on the nature and extent of an employer's obligations, with *Fort Halifax* emphasizing the overall degree of burden placed on the employer. *Rodowicz v. Mass. Mutual Life,* 192 F.3d 162, 170 (1st Cir.1999) (citing *Belanger,* 71

F.3d at 454); *Simas v. Quaker Fabric,* 6 F.3d 849, 853–854 (1st Cir.1993). Thus, a proffered benefit scheme involving employer obligations not materially greater than those reflected in *Fort Halifax* does not amount to an ERISA plan. *Belanger,* 71 F.3d at 455.

**B   The Original Plan**

■ RHI's predecessor established the original severance policy, which was carried forward through RHI's acquisition of the Capital Grille. An eligible employee who was involuntarily terminated was entitled to collect: earned vacation pay, health insurance effective through last day paid, black card privileges until last day worked, and a salary continuance which was calculated according to a schedule of salary brackets and tenure periods. A salaried employee was disqualified from receiving these benefits only if terminated for having committed acts of "gross misconduct." The portion of compensation attributed to salary and length of service was paid in the form of a one-time lump-sum bonus check, and vacation benefits were paid as a salary continuance.

Based primarily on the rationales of *Fort Halifax* and *Gilmore,* this Court concludes that the original severance plan was not an ERISA plan. The original plan most closely resembles the plan at issue in *Gilmore.* Pursuant to a plant closing, the severance payments at issue in *Gilmore* were offered to resigning employees who provided fourteen days notice of resignation, who were active employees on the payroll at the time of resignation, and who obtained "mutual agreement" from the plant manager authorized to consent to resignations. Based on years of service and current salary-level, an employee who satisfied these elements received a one-time, lump-sum payment. *Gilmore,* 917 F.Supp. at 686.

The severance benefits in the original plan are not distinguishable from *Gilmore* with respect to the first two factors outlined. Both plans required payments which were to be made in a one-time, lump-sum installment. Furthermore, both benefits created a short-term obligation on the employer, compared with other plans involving extended medical coverage or career outplacement services which sometimes continued well beyond employment termination. *Champagne*, 997 F.Supp. at 223. Although, the cases are distinguishable based on the third and fourth *Gilmore* factors, the reasoning of *Gilmore* is applicable to the present case and requires the same conclusion, i.e. that the original plan which RHI inherited did not constitute an employee welfare benefit "plan" under ERISA.

The third factor in *Gilmore* indicates that a plan where severance payments are not triggered by a single event (such as a factory closing) weighs toward finding an ERISA plan. *Gilmore*, 917 F.Supp. at 688. However, returning to the analysis in *Fort Halifax*, this Court concludes that the original plan is not an ERISA plan, notwithstanding that new obligations are made to employees as each is terminated. In an earlier ruling the First Circuit stated, "[b]ut so long as *Fort Halifax* prescribes a definition based on the extent and complexity of administrative obligations, line drawing of this kind is necessary and close cases will approach the line from both sides." *Simas*, 6 F.3d at 854. Therefore, although employees will become eligible over time for various reasons, this Court concludes that the administrative burden measured under this element is not significant enough in scope and degree to bring the original plan over the *Fort Halifax* threshold.

The last *Gilmore* factor at issue is the focus of the contest between the parties in this case. The question is whether the severance "plan" requires the employer to engage in a case-by-case review of employees in order to determine their particular eligibility under the applicable criteria. *Gilmore*, 917 F.Supp. at 688. Both the *Gilmore* scheme and the original plan require a purely mechanical determination with respect to all but one aspect of the severance plans. In *Gilmore*, this was the requirement that employees secure "mutual agreement" or consent from the plant manager. Under this system, the plant manager decided whether an employee should be induced to resign depending on company needs to fill remaining orders. The Court stated:

> Once [the plant manager] decided it was in the company's best interest to encourage the resignation of a particular employee, the payment of severance was mechanical, and no ongoing administrative scheme was implemented. This discretion by the company regarding whether to offer severance to an employee did not render the severance benefits an ERISA plan.

*Id.* at 689. Therefore, notwithstanding the plan's discretionary aspect the Court ruled that the plan was not an ERISA plan.

Like the plan in *Gilmore*, the original plan had a subjective element. The employer had the discretion to withhold benefits from employees discharged for "acts of gross misconduct." To ascertain whether the grounds for dismissal amounted to "acts of gross misconduct," management employed a case-by-case review of each termination using a list of sixteen specific actions characterized as such. However, because the list was not exhaustive, managers were given the discretion to use judgement in deciding whether an employee was disqualified from receiving benefits.

Given the fact-intensive analysis required to make an ERISA classification,

courts have consistently avoided adopting a bright-line rule to decide whether an employer's "for cause" determination was, in itself, enough to support the finding of an ERISA plan. *O'Connor v. Commonwealth Gas,* 251 F.3d 262, 269 (1st Cir. 2001) (for-cause determination did not involve the type of discretionary determination subject to abuse that triggers an employer's fiduciary obligation to its beneficiaries); *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 935 (8th Cir. 1999) (finding ERISA plan where eligibility for severance pay required employer to evaluate the quality of employee's service); *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 76 (2d Cir.1996) (ERISA implicated where employer determines whether fired employee had made a "good faith effort" to secure employment elsewhere).

The cases which have dealt with "for cause" criteria and bear the closest relationship to the facts at bar are *Simas v. Quaker Fabric,* 6 F.3d 849 (1st Cir.1993), and *Rodowicz v. Mass. Mutual Life,* 192 F.3d 162 (1st Cir.1999). The *Simas* Court found that an ERISA plan existed because the determination of whether an employee was discharged for cause was "likely to provoke controversy and call for judgements based on information well beyond the employee's date of hiring and termination." *Champagne,* 997 F.Supp. at 225 (quoting *Simas,* 6 F.3d at 853). However, the *Simas* plan required the employer to maintain records, apply the "for cause" criteria, and make payments or otherwise actively dispute the obligation, which involved "ongoing obligations materially beyond those present in *Fort Halifax*." *Simas,* 6 F.3d at 853–854. Likewise, the *Rodowicz* plan also authorized eligibility disqualifications for employees who were involuntarily terminated and provided an appeals process for aggrieved employees to challenge that determination, which

made it "somewhat less mechanical and unthinking." *O'Connor,* 251 F.3d at 268 (quoting *Rodowicz,* 192 F.3d at 172). Nonetheless, the Court found the *Rodowicz* severance scheme was not an ERISA plan because the "for cause" determination bore little weight compared with the non-ERISA qualities of the overall plan. *Id.*

This Court concludes that the administrative obligation which the "gross misconduct" determination imposed on management did not go beyond *Fort Halifax,* thus it is inappropriate to treat the original plan as an ERISA plan. Equipped with a list of sixteen acts classified as "gross misconduct," each manager was aware of the types of behavior severe enough to justify denying severance benefits. Thus, the exercise of managerial discretion was limited to acts unforeseen at the time the list was drafted, and administration of the "for cause" criteria would usually require a straightforward application of the listed "acts of gross misconduct."

In sum, the original plan did not create an administrative burden substantial enough to invoke ERISA status. Once the guided "for cause" determination was made, no administrative apparatus, either to calculate or to distribute the promised benefit, was involved. Only a simple, arithmetical application of the salary table was required. Furthermore, under the original plan an underlying purpose of ERISA was not compromised. "Since a single-shot benefit requires no greater assurance than that the check will not bounce, ERISA's panalopy of protections has virtually nothing to do with such a simple task." *Belanger,* 71 F.3d at 454 (citing *Fort Halifax,* 482 U.S. at 16, 107 S.Ct. 2211). Rather, only the ongoing obligations which are uniquely vulnerable to employer abuse or carelessness "thus require ERISA's special prophylaxis." *O'Connor,* 251 F.3d at 267 (quoting *Belan-*

*ger,* 71 F.3d at 454). Therefore, this Court concludes that the original plan was not an "employee welfare benefit plan" regulated by ERISA.

### C   The New Plan

■ The original severance policy which RHI amended became effective roughly six weeks before plaintiff's employment was terminated. As with the original plan, an eligible employee subject to involuntary termination became entitled to collect: earned vacation pay, health insurance effective through last day paid, and black card privileges until the last day worked. Furthermore, the plan in part reads:

> Upon involuntary termination of employment, and under circumstances where it is deemed necessary to accommodate employees with continued compensation, VP level management (in consultation with Human Resources) will determine the appropriateness and calculation of a severance package. Due to the numerous variables involved, subjective judgement is necessary in making the determination of extended pay. Severance pay may be more or less depending on a wide variety of situations.

Plaintiff's Exhibit B. Therefore, with respect to extended pay, the new plan was effectively reduced to a lump-sum payment awarded and calculated at the sole discretion of VP-level management.

An application of the four *Gilmore* factors to the new plan reveals an even split. While the one-time, lump-sum payment weighs against finding an ERISA plan, the new plan possesses ERISA attributes as well. These include the subjective element of managerial discretion and obligations which are not triggered by a single event. While the same split was found under the original plan, there was sufficient information about its qualities to weigh the scope and extent to which the factors applied.

But because the new plan is too vague and ambiguous, application of the *Gilmore* factors in isolation is inappropriate. "It is a matter of degrees but under *Fort Halifax* degrees are crucial." *Simas,* 6 F.3d at 853.

Therefore, "[t]he beacon by which we must steer" to determine whether the new plan is a covered ERISA plan is the Supreme Court's opinion in *Fort Halifax. Belanger,* 71 F.3d at 454. The Supreme Court stated, "[t]he focus of [ERISA] thus is on the administrative integrity of benefit plans—which presumes that some type of administrative activity is taking place." *Fort Halifax,* 482 U.S. at 16, 107 S.Ct. 2211. The salary table and list of "acts of gross misconduct" provided under the original plan were eliminated, leaving the manager with no administrative apparatus to implement or guidelines to follow. Therefore, by leaving all aspects of eligibility and calculation to the discretion of management, the new severance plan involves less administration than the original plan required.

The degree of administrative burden is lessened further by the elimination of the "gross misconduct" threshold which disqualified an employee under the original plan. This also results in a wider latitude of discretion exercised by management, requiring reconsideration of the fourth *Gilmore* factor within the context of the new plan. In order to trigger ERISA's oversight, "the plan at issue, viewed as a whole, must require the exercise of discretion to the degree that would justify saddling an employer with fiduciary responsibility and foreclosing an employee's state claims." *O'Connor,* 251 F.3d at 271. The First Circuit has ruled that ERISA is not implicated where the administrator of a plan "was authorized in his discretion to exclude all employees who had been terminated 'for any reason or no reason at all,'"

because no careful assessment of "cause" would be required. *Rodowicz,* 192 F.3d at 171. Furthermore, with respect to the plant managers who authorized "mutual agreement," the *Gilmore* court stated:

> the discretion involved in defendant's severance "policy" was in deciding whether to offer severance benefits at all, rather than in deciding which employees would be eligible for the severance benefits. Once [the plant manager] decided it was in the company's best interest to encourage the resignation of a particular employee, the payment of severance was mechanical, and no ongoing administrative scheme was implemented.

*Gilmore,* 917 F.Supp. at 689. Therefore, the discretion exercised by RHI management in offering severance benefits to certain employees over others does not in itself create an ERISA plan.

Furthermore, RHI's expressed commitment to provide benefits to involuntarily terminated employees is weaker under the new scheme, weighing against a finding that an ERISA plan exists. *Belanger,* 71 F.3d at 455. The *Belanger* Court stated:

> One very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits. Thus, evidence that an employer committed to provide long-term or periodic benefits to its employees will often be telling.

*Id.* Thus, "the crucial factor in determining if a 'plan' has been established is whether the [proffering of an employee benefit] constituted an expressed intention by the employer to provide benefits on a regular and long term basis." *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1083 (1st Cir.1990); *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

Under the original plan, involuntarily terminated employees were certain to receive benefits if the dismissal did not follow an act of gross misconduct. But, according to RHI's new plan, an employee might not receive benefits regardless of the reason or cause for termination. Therefore, because a reliable commitment to provide employee severance benefits is lacking "from the employees' place of vantage," the new plan does not possess an additional ERISA quality. *Id.*

In sum, this Court concludes that the new plan does not amount to an ERISA plan. The lack of any explicit eligibility standards or distribution mechanisms result in an administration too unsophisticated to pass the *Fort Halifax* threshold. Furthermore, the plan does not promise to maintain earmarked assets of the type which are subject to the potential abuses ERISA was intended to foreclose. Therefore, the ERISA regulations are inapplicable to the new RHI plan.

## IV CONCLUSION

This Court concludes that both severance plans in question are not ERISA plans. Therefore, defendant's motion for summary judgement on plaintiff's ERISA claim (Count III) is granted. The only claims remaining (Count I and II) are for breach of contract implicating state law only. This Court could consider and decide the plaintiff's state law claims only under the supplemental jurisdiction doctrine. The applicable statute states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (1994). However, the exercise of supplemental jurisdiction is discretionary. *The Lares Group, II*

*v. Tobin,* 47 F.Supp.2d 223, 235 (D.R.I. 1999), *aff'd by, Lares Group, II v. Tobin,* 221 F.3d 41 (1st Cir.2000). In making its decision the Court should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996). In the past, this Court has been mindful of the concerns of federalism and cautious of wasting federal judicial resources, declining the opportunity to interpret state law in matters devoid of any federal interest. *Lares Group II,* 47 F.Supp.2d at 235. Plaintiff's breach of contract claims relating to the company stock options and severance pay implicate Rhode Island law and should be decided by the Rhode Island Court where plaintiff originally brought this action.

Therefore, the Clerk shall enter judgement for defendant on the ERISA claim (Count III) and remand the remaining Counts to the Rhode Island Superior Court sitting in Providence County.

It is so ordered.