The LARES GROUP, II, John G. Laramee, individually and as General Partner, and Sharon Laramee, Plaintiffs,

v.

Bentley TOBIN, Matthew J. Marcello, III, Michael B. Nulman, a Rhode Island law partnership known as Hinckley, Allen & Snyder, Joseph Mollicone, Jr., Joseph DiBattista, Matthew T. Marcello, III, all individually and as trustees of Pine Street Realty Trust under a Declaration of Trust dated January 8, 1988, and as the General Partners of Pine Street Trust Limited Partnership and individually, and Rodney M. Brusini, Edward D. Diprete, Henry W. Fazzano, Edward F. Ricci, and John S. Renza, Sr., Defendants,

C.A. No. 95–463L.

United States District Court,
D. Rhode Island.

April 19, 1999.

Robert A. D'Amico, II, D'Amico Birchfield & Ferrucci, Providence, RI, Evans J. Carter, Hargraves, Krab, Wilcox & Galvani, Framingham, MA, for plaintiffs.

Robert Clark Corrente, Hinckley Allen & Snyder, Providence, RI, (Tobin, Marcello, Nulman, Hinckley Allen), Joseph V. Cavanagh, Jr., Karen Ann Pelczarski, Blish & Cavanagh, Providence, RI, (Marcello, DiBattista, Weisberg), Richard A. Gonnella, Providence, RI, (Brusini), Peter J. McGinn, Tillinghast Licht & Semonoff, Providence, RI, (DiPrete), Richard A. Boren, Visconti & Boren Limited, Providence, RI, (Fazzano), Herbert F. DeSimone, Providence, RI, (Ricci), John F. Dolan, Rice Dolan & Kershaw, Providence, RI, (Renza), Joseph Mollicone, Jr. (pro se), for defendants.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

Plaintiffs, owners of an office building, sought to lease their building to a department of the State of Rhode Island in the late 1980s. The State eventually chose another building, owned by several of the named defendants. In the wake of public revelations of official corruption reaching into the highest levels of state government, plaintiffs brought this action for civil damages resulting from the failed attempt to lease property to the State. This suit takes aim at the rival building owners, officials of the State, as well as attorneys and bankers involved in the lease. The plaintiffs' weapon of choice is the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68. ("RICO"). Riding the coattails of that sole federal claim are sundry state causes of action based upon statutory provisions and common law. At the heart of the RICO claim is the allegation that plaintiffs were denied State business because defendants were participants in a complex scheme of rigging the building selection process through bribery and extortion. This matter is now before the Court on Motions for Summary Judgment offered by several defendants. For the reasons stated below, the Motions are granted.

## BACKGROUND

The context within which this dispute evolved represents a sordid chapter in recent Rhode Island history, one that is well-known to citizens who have witnessed the conviction of a former governor for his violations of the public's trust. Revealed by this shameful episode was a government that often was for sale to the highest bidder. Although plaintiffs have produced volumes of evidence describing in sorrowful detail the particulars of this culture of bribery and corruption, given the current procedural posture of this case the facts essential to resolving these Motions may be summarized briefly.

In early 1988, the Rhode Island Department of Employment and Training[1]

---

1. Although the department was named the Department of Employment Security when these events began, the agency was subsequently renamed the Department of Employment and Training. For the sake of clarity,

("DET") sought to acquire new office space for its headquarters to make way for the planned construction of the Rhode Island Convention Center on the site of the old DET offices in Providence, Rhode Island. At that time, plaintiff John G. Laramee ("Laramee"), a Connecticut businessman, was the General Partner of The Lares Group II ("Lares"), a Rhode Island limited partnership that owned the Leesona Building in Warwick, Rhode Island.

DET officials expressed some interest in the Leesona Building to Laramee and soon thereafter conducted several views of the site in February and March 1988. According to Laramee, after reviewing the building, DET officials indicated that the Leesona Building met the Department's needs. However, at no time did representatives of the State commit in any way to lease the Leesona Building. Furthermore, these discussions took place even before the State had prepared official public bid specifications. In May, DET's Finance Director prepared a draft public bid announcement, one that was never released, limiting bid proposals to buildings within the City of Warwick.

The State issued the official Invitation for Lease Proposal ("ILP") for the new DET headquarters in June 1988. The ILP specified that qualifying buildings needed to be located in the "periphery of the Central Business District of the City of Providence." Unlike its status under the draft ILP written by DET's Finance Director, under the terms of the official ILP, Laramee's Leesona Building in Warwick was not a qualified proposal.

On November 29, 1988, the Rhode Island Department of Administration, the agency charged with managing state government properties, selected the Metcalf Building in Providence as the location for the new DET offices. The Metcalf Building was owned by Pine Street Realty Trust and Pine Street Realty Associates Limited Partnership (collectively, "Pine Street"). Of the bidders qualified under

the Court will use the name "DET" exclusive-

the official ILP, Pine Street was the lowest bidder for the project. Defendants Joseph DiBattista, Matthew J. Marcello, III ("Marcello"), and Joseph Mollicone, Jr. ("Mollicone") were trustees of the Pine Street trust and general partners of the Pine Street limited partnership. Plaintiffs also allege that defendants Rodney M. Brusini ("Brusini"), Edward D. DiPrete ("DiPrete"), Henry W. Fazzano ("Fazzano"), and Edward F. Ricci owned equity interests in the Pine Street venture at relevant times. Defendant lawfirm Hinckley, Allen & Snyder represented Pine Street in its dealings with the State in the DET matter. The firm also represented at various times Laramee in several of his business ventures.

Plaintiffs allege that Pine Street partners engineered the change in the ILP specification from Warwick to Providence and obtained the State's award by bribing DiPrete, then the Governor of the State of Rhode Island. For the purposes of these Motions, the Court need not rehash plaintiffs' allegations in great detail. The essence of the story, according to the version proposed by plaintiffs, is as follows. In May 1988, Mollicone met with the Director of DET, defendant John S. Renza, Jr., and the governor's campaign finance director and Pine Street partner Brusini, to arrange the fix. In exchange for the selection of the Pine Street proposal, DiPrete would receive $50,000 in cash and a share in the Pine Street business. By April 1989 the transaction was largely complete: the State had executed a lease for the Metcalf Building and Pine Street partners had delivered bribes to Brusini, who forwarded the cash to DiPrete.

Laramee, suspicious of the circumstances surrounding the selection of the Metcalf Building, launched an aggressive publicity campaign questioning the award of the state lease. In addition to writing letters to several newspapers calling into doubt the propriety of the lease, Laramee

ly.

contacted numerous public officials including representatives of the Governor's Office, the Rhode Island Department of the Attorney General, the United States Attorney for the District of Rhode Island, and Rhode Island's Congressional delegation. These pleas for investigation began in late 1988 and continued into 1989. Typical of Laramee's complaints were his declarations in September 1988 that there were "irregularities" in the selection process, a charge made to the Governor's Office. Laramee also charged that the process had been "rigged," a belief he expressed to the head of the Rhode Island Republican Party and an attorney who was the former mayor of Warwick and who, Laramee suspected, had political ties to DiPrete.

Laramee contends that he and his business paid a price for his probe into the validity of the DET lease. According to the Amended Complaint, Laramee was the target of reprisals for his attempt to shed sunlight on the allegedly corrupt selection process. He argues that defendants Fazzano, Marcello, and Bentley Tobin ("Tobin"), a partner in the Hinckley, Allen law firm and a director of Eastland Bank ("Eastland"), caused Eastland, the holder of the Leesona Building's mortgage, to sabotage Laramee's personal and business finances. According to plaintiffs, Fazzano, Marcello, and Tobin used unspecified means to force Eastland to declare the Leesona Building mortgage in default, to exercise an assignment of rents clause in the mortgage agreement, to close Laramee's personal line of credit, and to coerce Laramee and Lares to execute under economic duress a forbearance letter restructuring their debts with Eastland. Plaintiffs claim that these actions forced Lares into receivership. All of these actions occurred in 1989 and 1990.

Furthermore, plaintiffs allege that these three defendants, beginning in December 1992, maliciously interfered with the Lares receivership. Plaintiffs contend that these three defendants again used unidentified tactics to coerce the court-appointed receiver to deny plaintiffs surplus funds from the receivership. It is also alleged that Tobin, Fazzano, and Marcello caused Lares to be audited by Eastland and that the three "continued to harass, deal unfairly and damage [Laramee] and Lares because he would not stop trying to have various governmental officers look into and void the Pine Street Lease." Amended Complaint ¶ 58. According to the Amended Complaint, these three defendants also "refused to permit Eastland Bank to accept a reasonable plan presented by the receiver" to rescue Lares from financial disaster. Amended Complaint ¶ 61. In addition, Tobin is charged with opposing a loan to Laramee from a third party. The pleading charges that when "Tobin got wind of the proposed loan [he] was able to dissuade this third-party from making" the loan. Amended Complaint ¶ 63.

Plaintiffs assert that defendants' conduct with regard to the DET lease and the Eastland credit relationship gives rise to causes of action under federal and state law. Accordingly, they filed this lawsuit on August 30, 1995. On December 8, 1997, this Court granted plaintiffs' motion to file the Amended Complaint now before the Court. The Amended Complaint details eleven counts. Count I alleges a cause of action under the civil liability provision of the Rhode Island anti-bribery statute, R.I.Gen.Laws § 11–7–6. Count II alleges a cause of action under the federal RICO Act, 18 U.S.C. §§ 1961–68. The remainder of the counts in the Amended Complaint are based on state common law theories. Count III alleges a cause of action for breach of the covenant of good faith and fair dealing. Count IV alleges a cause of action for "Aiding and Abetting Harm to Third Parties." Count V alleges a cause of action for civil conspiracy. Count VI alleges a cause of action for intentional interference with contractual relations. Count VII alleges a cause of action for breach of fiduciary duty. Count VIII alleges a cause of action for "Prima Facie Tort, Commercial Bad Faith and Unlawful Economic Du-

ress and Common Law Tort." Count IX alleges a cause of action for intentional infliction of emotional distress. Count X alleges a cause of action for loss of consortium suffered by plaintiff Sharon Laramee. Count XI alleges a cause of action for loss of consortium suffered by plaintiff John Laramee. Plaintiffs argue that all defendants are jointly and severally liable under each of the counts.

The parties have engaged in extensive discovery for several years, including the taking of numerous depositions and the production of many documents. Now several defendants move for summary judgment on a number of grounds.[2] Most importantly, defendants target plaintiffs' RICO claim. Procedurally, defendants contend that the RICO claim is time-barred by the statute of limitations applicable to the civil racketeering statute. Substantively, defendants contend that plaintiffs have failed to produce sufficient competent evidence to establish each of the necessary elements of a RICO cause of action. Finally, defendants argue that this Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims if the Court finds the RICO count deficient.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.' " *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

On a motion for summary judgment, the Court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I. 1991).

### II. Subject Matter Jurisdiction

Subject matter jurisdiction in this case rests on the federal question doctrine. This Court may exercise jurisdiction over plaintiffs' RICO claim under 18 U.S.C. § 1964. The state law causes of action are piggybacked onto the RICO claim based on this Court's supplemental jurisdiction under 28 U.S.C. § 1367. This is the only theory of federal jurisdiction available to plaintiffs. Diversity jurisdiction under 28 U.S.C. § 1332 cannot be invoked here because there is a lack of complete diversity

---

**2.** The Motions for Summary Judgment were filed by defendants Rodney M. Brusini, Joseph DiBattista, Henry W. Fazzano, Hinckley, Allen & Snyder, Matthew J. Marcello, III, Michael B. Nulman, John S. Renza, Sr., Edward F. Ricci, and Bentley Tobin. Defendants Edward D. DiPrete and Joseph Mollicone, Jr. did not file motions.

among the parties. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (following the complete diversity rule first enunciated by the Supreme Court in *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806)); *Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 642 (1st Cir.1995) (same). Plaintiffs cannot satisfy the complete diversity requirement of § 1332 because one of the partners in Lares, Donald Wignall, is a Rhode Island resident and several of the defendants are also Rhode Island residents. *See Carden*, 494 U.S. at 195–96, 110 S.Ct. 1015 (holding that for the purposes of determining diversity jurisdiction, courts must consider the residency of every partner in an unincorporated association). Determining the sufficiency of the sole federal claim, therefore, is of primary importance because the basis of this Court's jurisdiction hangs in the balance.

## III. The RICO Count

### A. Elements of the cause of action

█ Federal law provides for both criminal penalties and civil remedies against individuals who participate in racketeering. The civil cause of action for victims of racketeering allows that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). In addition to establishing a violation of § 1962, a RICO plaintiff must prove both factual and proximate causation between the racketeering and a legally-cognizable injury. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir.1987).

█ A violation of § 1962 consists of four essential elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted); *see* 18 U.S.C. §§ 1961–62. The RICO statute provides that an "enterprise" may consist of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise must form an entity "separate and apart" from the pattern of racketeering activity with which it is charged. *Libertad v. Welch*, 53 F.3d 428, 441–42 & n. 10 (1st Cir.1995). A pattern of racketeering activity "requires at least two acts of racketeering activity, ... the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The crimes that qualify as racketeering activity are enumerated in § 1961 and include among many others, the crimes of bribery, extortion, and mail fraud, all of which are alleged in the Amended Complaint. *See id.* § 1961(1).

Plaintiffs contend that these criminal acts were conducted by the individual defendants as an enterprise with the goals of preventing Lares from winning the DET lease and, later, silencing Laramee in his attempt to expose the alleged corruption. According to this theory, these acts of racketeering activity damaged plaintiffs' business by denying them the income of the DET lease and damaging their relationships with creditors.

### B. The statute of limitations defect

█ The RICO claim must fail because it is barred by the statute of limitations. The United States Supreme Court has ruled that a four-year statute of limitations applies to civil RICO claims. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct.

2759, 97 L.Ed.2d 121 (1987); *Rodriguez v. Banco Central,* 917 F.2d 664, 665 (1st Cir. 1990). Left undefined by the Supreme Court, however, was the matter of accrual.[3] Plaintiffs attempt to exploit the split among the circuits on this issue. At least four federal courts of appeals have held that a RICO claim accrues and, therefore, the statute of limitations on that claim begins to run when the plaintiff has discovered, or should have discovered, both an injury to himself and the pattern of racketeering activity that caused the injury. *See Granite Falls Bank v. Henrikson,* 924 F.2d 150, 154 (8th Cir.1991); *Bath v. Bushkin, Gaims, Gaines & Jonas,* 913 F.2d 817, 820 (10th Cir.1990), *rev'd on other grounds, Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 354, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Bivens Gardens Office Bldg., Inc. v. Barnett Bank,* 906 F.2d 1546, 1554–55 (11th Cir.1990); *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1130 (3d Cir. 1988).

The United States Court of Appeals for the First Circuit has adopted a different rule. Despite plaintiffs' attempt to finesse the import of the First Circuit's decision, it is clear that in this circuit, the majority rule applies. Under the "injury discovery" rule adopted by the First Circuit, the statute of limitations on a civil RICO claim begins to run "when a plaintiff knew or should have known of his injury." *Banco Central,* 917 F.2d at 666. In this circuit, the meter begins to tick when the plaintiff discovers the injury, even if the plaintiff is unaware of the precise acts of racketeering that caused the injury. *See Hodas v. Sherburne, Powers & Needham,* 938 F.Supp. 60, 63 (D.Mass.1996) (explaining that plaintiff's "plea that he did not know of the 'conduct' that caused his injury is clearly insufficient to alter the accrual date of his claim"). This formulation of the rule is in the majority among the other federal courts of appeals that have addressed the issue. *See Rotella v. Wood,* 147 F.3d 438, 440 (5th Cir.1998), *cert. granted,* —— U.S. ——, 119 S.Ct. 1139, 143 L.Ed.2d 207 (1999); *Detrick v. Panalpina, Inc.,* 108 F.3d 529, 537 (4th Cir.1997); *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1464 (7th Cir.1992); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988); *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 274–75 (9th Cir.1988). Under the *Bankers Trust* accrual rule, expressly adopted by the First Circuit in *Banco Central,* "each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury." *Bankers Trust Co.,* 859 F.2d at 1105; *see Banco Central,* 917 F.2d at 666–68 (adopting the *Bankers Trust* accrual rules for civil RICO claims). Accordingly, this Court must evaluate each of plaintiffs' two claimed injuries separately under the RICO statute of limitations standard.

 Plaintiffs filed this lawsuit on August 30, 1995. Any injury that plaintiffs were aware of, or should have been aware of, before August 30, 1991 may not constitute a basis for the present civil RICO cause of action. Even when viewing the evidence in the light most favorable to plaintiffs, the proposed cause of action cannot survive this scrutiny. Although plaintiffs do not clearly enumerate the injuries that underlie their RICO claim, the Court has sifted through the Amended Complaint, no model of perspicuity, and identified two injuries alleged by plaintiffs to have been caused by the actions of defendants.

First, plaintiffs contend that they were damaged by the award of the DET lease to the owners of the Metcalf Building. This injury is easy enough to understand—plaintiffs claim that they lost potential rents due to the alleged scheming of defendants. Second, they allege that

---

3. The Court notes that the United States Supreme Court is likely to rule on this very issue this term in the appeal of *Rotella v. Wood,* 147 F.3d 438 (5th Cir.1998), *cert. granted,* —— U.S. ——, 119 S.Ct. 1139, 143 L.Ed.2d 207 (1999).

they were harmed by the forced receivership of Lares. Following plaintiffs' line of reasoning, the corrupt machinations of defendants in their conspiracy to torpedo Laramee's business forced Laramee's hand and drove him to file for Lares' receivership. The Amended Complaint describes two tactics used by the members of the alleged conspiracy to silence plaintiffs. First, defendants interfered with Eastland's credit relationships with both Laramee and Lares, somehow forcing the bank to tighten its grip on the debts owed by Laramee and Lares, and eventually choking-off all funds. Second, plaintiffs accuse defendants of meddling with the receivership itself. They charge defendants with preventing the receiver from disbursing surplus funds, forcing an audit of their business, and preventing plaintiffs from securing credit from alternative sources.

Nevertheless, there can be no doubt that the injury allegedly suffered by plaintiffs as a result of the State's award of the DET lease occurred before August 30, 1991. Plaintiffs were well aware in 1989 that the Leesona Building would not be selected by the State for the new DET offices. For the purposes of the statutory bar, nothing more need be said. The second injury allegedly suffered by plaintiffs, the forced receivership of Lares, is also barred because plaintiffs filed for the receivership of Lares in January 1990 due to the "wrongful actions" of defendants, according to the Amended Complaint. Consequently, any RICO claim predicated on this alleged injury is also barred.

### C. The fraudulent concealment claim

■ Yet plaintiffs are unwilling to concede defeat so readily. In a fruitless attempt to stave off application of the civil racketeering statute of limitations, plaintiffs seek the shelter of the fraudulent concealment doctrine. The First Circuit has recognized that the civil RICO statute of limitations may be tolled by a defendant's acts of fraudulently concealing the nature of his wrongdoing. *See Banco Central,* 917 F.2d at 667–68. Plaintiffs must establish three elements to invoke the fraudulent concealment defense with success: (1) wrongful concealment of their actions by the defendants (2) which prevented plaintiffs' discovery of their cause of action within the statutory period and (3) due diligence on the part of plaintiffs in attempting to ferret out the claim. *See Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir.1984); *Hodas,* 938 F.Supp. at 63; *see also Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 194, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997).

■ Plaintiffs bear the burden of demonstrating that defendants concealed "the facts that might lead one to suspect anything." *Hodas,* 938 F.Supp. at 63; *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218–19 (4th Cir.1987). Such concealment must be the result of affirmative efforts by defendants to prevent plaintiffs from discovering the wrongdoing. *See Grimmett v. Brown,* 75 F.3d 506, 514–15 (9th Cir.1996). Furthermore, resort to this equitable doctrine is inappropriate merely because a plaintiff did not know each and every detail of his cause of action within the statutory period.

■ Based on the evidence in the record, this Court concludes that plaintiffs had enough knowledge of the wrongful acts of defendants during the statutory period to preclude application of the fraudulent concealment doctrine at this stage of the proceedings. In addition to contacting numerous governmental agencies and local newspapers as far back as 1989 to demand investigation of the DET lease, Laramee frequently discussed the circumstances surrounding the award of the lease to Pine Street well before expiration of the statute of limitations. The substance of these discussions, acknowledged by Laramee in his sworn deposition, closely resembles the essence of the charges in the Amended Complaint.

In November 1988, before the ILP was officially awarded, Laramee met with two people he believed could provide him with access to the governor, John Holmes, the head of the Rhode Island Republican Party and James Taft, the former mayor of the City of Cranston. Laramee sought this political access because he believed that defendants were engaged in wrongdoing and that the improper conduct was being directed by powerful political forces within state government. At Laramee's deposition, the following exchange took place regarding that 1988 meeting:

Question: And that meeting was for approximately two and a half hours with Jim Taft, correct?

Answer: Yes.

Question: And at that meeting you said that you did not believe that things were correct with respect to the granting of this lease?

Answer: Correct.

Question: That you felt that it was rigged?

Answer: That's what I was told by two people in state government.

Question: And at that time you knew about Joe Mollicone, correct?

Answer: Yes.

Laramee Deposition, vol. III, at 149–50. While Laramee may not have used the words bribery and extortion, the clear import of his use of the word "rigged" is that the award of the lease was controlled by improper considerations and illegal influences. At an earlier deposition, Laramee admits that he knew that "the deal was orchestrated" for the benefit of Pine Street. Laramee Deposition, vol. I, at 85. That such orchestration was overseen by the Governor's Office was apparent to Lar-amee, given his deposition statement that the change of the ILP's geographic specification was ordered by the Governor's Office.

Much of the substance of plaintiffs' RICO cause of action was described in open court by an attorney who represented Laramee in a receivership action filed in state court in 1990. At a hearing in Rhode Island Superior Court in March 1991, Laramee's attorney explained that the Lares receivership was compelled by the award of the DET lease to Pine Street. The attorney blamed the loss on several parties who are now defendants in the present action and who helped Pine Street secure the lease, including Tobin and Mollicone. The lease was not awarded to Lares, according to Laramee's attorney, because of the "tortious interference" of defendants. The lawyer concluded by referring to "this Bank's complicity, and these law firms' involvement in this mess." Laramee Deposition, vol. I, at 86–88.

■ This evidence, along with similar examples within the voluminous record, scuttles plaintiffs' attempt to rescue their RICO cause of action by deploying a fraudulent concealment claim. The effort founders on the ample evidence of plaintiffs' "knowledge" of the alleged wrongdoing as early as 1988. For the purposes of determining the merit of plaintiffs' equitable attack on the statute of limitations, it is significant that much of the meat of the Amended Complaint can be traced back to statements made by Laramee well before August 30, 1991. For this reason, plaintiffs cannot establish a lack of knowledge of defendants' alleged wrongdoing, leaving the statute of limitations free to work its prohibition on the RICO count.[4]

---

4. Although it is unnecessary for the disposition of the Motions at issue, the Court is compelled to note that plaintiffs' allegations of fraudulent concealment are woefully inadequate under the pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure. The rule provides that "[i]n all averments of fraud or mistake, the circumstances constitut-ing fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The rule is applicable to civil RICO cases. *See Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1st Cir. 1996). Specifically, plaintiffs alleging fraudulent concealment as a basis for tolling the statute of limitations on a civil RICO action are obligated to satisfy the rule. *See Butala v.*

### D. Substantive defects in the RICO count

■ The effort to ground a RICO cause of action on the second injury alleged by plaintiffs, the forced receivership of Lares, suffers from further substantive ills. In essence, there is no basis in federal law for constructing a civil RICO cause of action on several of the deeds attributed to defendants in the Amended Complaint. None of the acts alleged by plaintiffs, apart from those involving bribery, extortion, and mail fraud surrounding the award of the DET lease, constitute predicate acts of racketeering activity under 18 U.S.C. § 1961(1). In the morass of the Amended Complaint, it is unclear exactly what predicate acts of racketeering plaintiffs mean to allege. What is clear is that several of the activities that plaintiffs label as predicate acts surely do not make the cut. Even a cursory examination of the RICO statute is sufficient to inform a diligent plaintiff that "conducting a continuing financial crimes enterprise in violation of 18 U.S.C. § 225," "making false statements on a Bank's records, in violation of 18 U.S.C. § 1001," and "anti-tying violations of the Federal Bank Holding Company Act, 12 U.S.C. § 1972(1)(c)" do not meet the definition of "racketeering activity" given by federal law. *See* 18 U.S.C. § 1961(1).

■ The only predicate crimes alleged by plaintiffs that satisfy the statutory definition of racketeering activity are bribery, extortion, and mail fraud.[5] *See id.* While

these crimes can be linked to specific alleged actions of several defendants in securing the DET lease, it is unclear how these crimes relate to plaintiffs' banking travails. Plaintiffs fail to explain how any of the alleged conduct of Tobin, Fazzano, and Marcello with regard to Eastland and the Lares receivership constitutes any one of these crimes. This Court is also unable to identify any relationship between the vague allegations and the definitions of the relevant crimes.

Plaintiffs are most clearly off the mark when they characterize as racketeering activity the alleged interference by several defendants into the decisions of both the receiver and Eastland officials. The Amended Complaint alleges that defendants "refused to permit Eastland Bank to accept a reasonable plan presented by the receiver which was most unusual." Amended Complaint ¶ 61. On the face of this allegation, no bribery, extortion, or mail fraud is alleged, nor have plaintiffs adduced any competent evidence that might transform this charge into the necessary predicate act of racketeering. The Amended Complaint overflows with similarly deficient claims. The pleading asserts that defendants "wrongfully refused to allow or permit the receiver to make any distributions of surplus funds to [Laramee]," Amended Complaint ¶ 60, that defendants "caused Lares to be audited" by Eastland, Amended Complaint ¶ 61, that defendants "continued to harass, deal unfairly and damage" plaintiffs, Amended

*Agashiwala,* 916 F.Supp. 314, 319 (S.D.N.Y. 1996). A well-pleaded allegation of fraud should include "specification of the time, place, and content of an alleged false representation." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980). Conclusory allegations of schemes and conspiracies of silence are inadequate. *See Doyle,* 103 F.3d at 194. Although the Amended Complaint explains in detail how plaintiffs believe they were harmed, it is bereft of specific examples of how plaintiffs were misled in their attempts to uncover the truth and what roadblocks defendants erected to prevent plaintiffs from following their path. Furthermore, plaintiffs fail to specify which defendants committed acts of concealment and when

they were committed. However, given the substantive inadequacies of plaintiffs' fraudulent concealment claim, this pleading defect need not be relied on by the Court in disposing of this matter.

5. Again, the Court is moved to note the failure of plaintiffs to properly plead fraud in the Amended Complaint. Although they allege acts of mail fraud, plaintiffs provide no details whatsoever describing which of the defendants used the mails to commit a fraud or when, how, where, and to what end the mails were used. *Plaintiffs' conclusory pleadings are wholly inadequate under Rule 9(b).*

Complaint ¶ 58, and that Tobin "was able to dissuade" a third party from loaning Laramee money, Amended Complaint ¶ 63. By characterizing these acts as "wrongful," plaintiffs do not transform them into racketeering activity. Merely tortious conduct is an insufficient basis for a civil racketeering remedy; plaintiffs must demonstrate that defendants' actions constitute predicate acts of racketeering as defined by 18 U.S.C. § 1961(1). No injury cognizable under the civil RICO statute arises from this alleged conduct.

■ Likewise, the charges underlying plaintiffs' claim of forced receivership do not rise to the level of racketeering activity. Two separate acts are alleged to have contributed to plaintiffs' decision to file for the receivership of Lares. Plaintiffs describe the first in the following way: "pursuant to Tobin and Fazzano's request on or about June 23, 1989 at a time when the Lares mortgage payment was less than twenty-five (25) days late, a bank officer wrongfully claimed that [Laramee] was in default, .... [and] a bank officer notified and seized the rents from the Leesona Building tenants." Amended Complaint ¶ 43. The second precipitating event, according to the Amended Complaint, was Eastland's decision to apply the proceeds of a second mortgage it granted on Laramee's residence to the outstanding balance on Laramee's personal line of credit. Again, plaintiffs claim that Eastland's conduct was part of defendants' conspiracy. They argue that the decision to use the mortgage proceeds to pay down Laramee's line of credit, instead of using the proceeds to rescue Lares, was made "because of Tobin and Fazzano's plan." Amended Complaint ¶ 51. None of the conduct that allegedly forced the receivership meets the statutory definition of racketeering activity found at 18 U.S.C. § 1961(1). Plaintiffs fail entirely to explain how the amorphous influences and plans of Tobin, Fazzano, and Marcello amount to bribery, extortion, or mail fraud.

Looking beyond the pleadings, even the evidence adduced by plaintiffs lends little support to their cause. Nothing in the record, even when viewed in the light most favorable to plaintiffs, provides support for the conclusion that any of the alleged conduct of defendants amounts to bribery, extortion, or mail fraud. In fact, plaintiffs' evidence fails even to provide a factual basis for the charges in the Amended Complaint.

Illustrative of the deficient nature of plaintiffs' RICO claim is the paucity of evidence linking defendants to actions of Eastland credit officials who actually made decisions that impacted Laramee and Lares. No reasonable jury could conclude, based on the evidence in the record, that any of the defendants caused either the receiver of Lares or officials of Eastland to take retaliatory actions against plaintiffs to silence or harm them. Amazingly, in his sworn deposition testimony Laramee concedes this total lack of an evidentiary basis. The following exchange between defense counsel and Laramee is typical of the "evidence" adduced by plaintiffs with regard to the alleged harms suffered by plaintiffs as a result of Lares' forced receivership:

Question: Do you have any facts to support your allegation that Bentley Tobin and/or Matt Marcello directed Eastland Bank to oppose the distribution of monies to you in the receivership?

Answer: That's my feeling.

Question: Do you have any facts?

Answer: No.

Question: Not your feelings.

Answer: No.

Laramee Deposition, vol. III, at 115.

In another exchange during this deposition, Laramee is questioned about the basis for his claim that Tobin and Fazzano pressured Eastland to sever its credit relationship with plaintiffs. When asked directly whether he was ever told by anyone that Tobin and Fazzano had forced the

bank to send the 1989 mortgage default letter, Laramee responds in the negative. The basis for his allegation, according to his own testimony, was his "belief" that the conspiracy must be so. Laramee's testimony is replete with similar declarations of his personal "belief," yet the evidence is devoid of facts that might lead Laramee to form a reasonable inference that the specific charges in the Amended Complaint are accurate. " 'Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact.' " *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993) (quoting *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992)). Plaintiffs fail to satisfy even the low evidentiary bar set by the "mere scintilla" standard for measuring the sufficiency of the plaintiffs' evidence on a motion for summary judgment. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

In summary, plaintiffs' alleged injury based on the loss of the DET lease is barred by the statute of limitations applicable to civil RICO actions. The injury based on the forced receivership is an inadequate basis for a RICO charge for either of the two reasons discussed—the statute of limitations bar or the failure to establish predicate acts of racketeering activity. Accordingly, plaintiffs' RICO cause of action fails as a matter of law. Unable to establish that they have been "injured in [their] business or property" in a way that would entitle them to civil remedies, plaintiffs' resort to the federal anti-racketeering statute is unavailing.

## IV. The State Law Counts

This Court declines to exercise jurisdiction over the remaining state law counts in the Amended Complaint. Because plaintiffs cannot establish diversity jurisdiction, this Court could consider their state law claims only under the supplemental jurisdiction doctrine. The relevant statute states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy." 28 U.S.C. § 1367(a). This Court has power to hear both state and federal claims if they all would ordinarily be expected to be tried in one judicial proceeding. *See Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 563–64 (1st Cir.1997); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 190 (1st Cir.1996). In particular, "[t]he state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, the exercise of supplemental jurisdiction is discretionary. *See Penobscot,* 112 F.3d at 564; *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 256–57 (1st Cir.1996). In exercising this discretion, the district court should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche,* 81 F.3d at 257.

The statute granting the district courts supplemental jurisdiction explicitly states that this Court may decline to exercise its discretion if it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Penobscot,* 112 F.3d at 564. In the case sub judice, no federal claims remain, leaving only a raft of state common law and statutory causes of action. This Court, mindful of the concerns of federalism and wary of wasting federal judicial resources, declines this opportunity to interpret state law in a matter devoid of any federal interest. The United States Supreme Court has counseled as much. The Court has explained that when all federal law claims are eliminated from the case before trial, in the usual case the balance of factors to be considered should lead the court to conclude that the "state

claims should be dismissed as well." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130; *see Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Therefore, the state law claims are dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the forgoing reasons, defendants' Motions for Summary Judgment on Count II are granted. Judgment as to Count II will be entered in favor of all defendants. Although two defendants did not move for summary judgment, it is clear that those defendants (DiPrete and Mollicone) are also entitled to summary judgment for the reasons explained in this decision. The Court declines to exercise supplemental jurisdiction on the remainder of the counts in the Amended Complaint. Therefore, Count I and Counts III through XI are dismissed without prejudice for lack of subject matter jurisdiction.

It is so ordered.